Gantt, P. J.
This is an action on the following note:
“$6,000. St. Louis, December 14, 1892.
“Thirty days after date, for value received, we promise .to pay to the order of the St. Louis National Bank sis thousand dollars, payable at St. Louis Na *186 tional Bank with interest from maturity at the rate of eight per cent per annum.
“A. K. Florida,
“F. G-. Flanagan.”
The petition was in the usual form. The answer of respondent Flanagan set up as a defense that he signed the note as maker with Florida for the accommodation purely of Florida and without receiving any value or consideration whatever, and that plaintiff knew this when it took the note; that Florida never negotiated or delivered the note for value to plaintiff, and, if he ever delivered it at all, plaintiff gave no value for it; that plaintiff did not acquire the note in good faith or in the ordinary course of business, but wrongfully appropriated the same, and pretended to discount it and place the proceeds of said discount to the credit of Florida for the purpose of paying an existing indebtedness of Florida to the bank, caused by overdrafts, to the amount of $7,789.53.
The reply denied all the allegations of the answer, but admitted that Florida was indebted to the bank upon his account current by overdrafts to the amount of $7,789.53, and averred that on the ninth day of January, 1893, Florida requested plaintiff to discount the note in suit; that this was done and the proceeds, $5,-989.34, were placed to Florida’s credit in his account current, and that plaintiff applied the same toward payment of his said overdrafts.
At the trial the plaintiff offered the note -in evidence and rested.
The defendant then offered to read the deposition of Lewis C. Nelson, taken by a notary public, August 23, 1893, at the instance and on behalf of defendant, as the declaration of the plaintiff. Plaintiff objected on the groimd that the said Nelson was in court. This was conceded to be the fact. But the court overruled the *187 objection and plaintiff excepted. Examined by Mr. Grover for defendant. The deposition was in substance as follows:
‘ ‘Am president of tbe plaintiff bank. Florida kept an account with plaintiff bank, a pretty extensive account. We often discounted paper for him; his account was often overdrawn.
“Q.‘ Now, I will ask you when you first saw this note that your bank sued on in this case (note shown to witness)? A. Well, I can not state exactly what ■ time I first saw it; it appears to have been discounted January 9; it has my official stamp upon it January 9, 1893.
“Q. That don’t answer the question. A. Well, I don’t know when I did see it first; I might have seen it first, December 14; you asked me a question that it would be preposterous for me to answer.
“Q. Can you state when it first came before the bank or before you for discount? A. Well, it was presented to me by Mr. Burr some time before it was discounted, a few days before, I think.
UQ. What do you mean by a few days? A. I mean a few days.
“Q. Three? A. It might have been three or ten, I should call either a few days.
“Q. Well, was it entered on your book when it was first presented for discount by Mr. Burr? A. No, sir, it wasn’t.
“Q. Was it presented for discount to you by Mr. Burr, or did Florida hand it to you the first time you say it was offered for discount? A. I am not positive; it might have been presented by both; I hnow it was presented by one or both.
‘ ‘ Q. Well, ivhat was done with it when it was first presented the first time? A. I declined to take it.
*188 “Q. On what' grounds? A. Well, I said Mr. Florida had all the money from the bank that he was entitled to at that time; he had borrowed all that I thought he ought to have.
“ Q. Was he in good credit at the time in your bank? A. Yes, sir, fairly so; so much so I would have taken that note with Flanagan’s indorsement on it.
UQ. Now, Mr. Nelson, Flanagan’s name was on it; why didn’t you take it? A. I have stated before that I thought he had all the money he was entitled to.
“Q. Flanagan’s name then, cut no figure in it when it was first presented? A. I shouldn’t have taken it in any event, unless Mr. Flanagan’s name had been there.
“Q. Mr. Flanagan’s name was not on all the paper Mr. Florida had in your bank at that time, was it? A. No, sir; somebody else’s name was, I suppose, eqully as good for what they represented.
“Q. When that note was first presented to you, you didn’t consider Mr. Florida’s single name as good for the amount? A. Well, there are very few single names that ‘go’ in our bank.
“Q. You didn’t consider Florida’s single name at the time that note was first presented to you for discount, you didn’t consider it as good? A. Well, it might have been good; I would not have taken it.
“Q. You would not? A. No, sir; I wouldn’t have taken it.
“Q. Do you know what amount of discount you carried for. Florida at that time? A. I don’t remember just now.
“Q. I mean at the time this was first presented for discount? A. I don’t remember just now.
“Q. Do you know whether those discounts, any of them, were paid off between the time this note was *189 first presented and'the time of the discount? A. My impression is, they were.
UQ. You don’t know? A. I think they were more than the amount of the note paid off from the time it was presented to the time it was presented and accepted; when it was first presented I considered his discount line amply full, considering the condition of the supply of money I had on hand at the time, and when it was presented the second time, I think his line had been materially reduced during the few days that had elapsed afterward.
“Q. Now, prior to the discounting of this note, hadn’t you had an interview at your residence at Normandy with Florida, at which Hammett was present, about his financial situation and about the money that he owed your bank? A. Prior to the discount of that?
“Q. Yes, sir; prior to the ninth of January, when that note was discounted. A. I believe I had.
“Q. It was on Sunday afternoon, wasn’t it? A. Yes, sir.
“Q. The eighth of January? A. I believe it was.
“A. As a matter of fact, was' his account overdrawn at that time of that eighth of: January, _ when you had this interview with him at your house? A. I am not sure about that, Mr. Grover; I am not as conversant with that as Mr. Burr is.
“Q. Now, please state what transpired about the discounting of this note on the ninth of January, the day after this interview at your house with Florida? A. Well, it was1 brought in again to me by Mr. Burr; he said it had been left with him to malte his accownt good at any time, or to use at any time we wanted to, I toolc it to malte his account good; I took it and passed on it; it was accepted by the board that day.
*190 “Q. That is the time you approved it, and it was passed upon to his credit as a discount? A. Yes, sir.
“Q. To make his account good? A. Yes, sir; I am not sure whether it was to make his account good that day, or whether he had paid sufficient, and we were willing to loan it to him; willing to take the paper; I think he had paid off some in the meantime, quite an amount more than that, since it had been first offered.
“Q. Well, you didn’t actually pass this up to his credit; you didn’t allow him to draw it out on his own check for his own benefit; you just passed it up to make his account good? A. I rather think he didn’t draw any of this out.
“Q. Isn’t it a matter of fact, on the eleventh day of January, two days after the time that the note was passed up to his credit as a discount, isn’t it a matter of fact his account was balanced and the balance shown against him? A. I don’t know when it was balanced, Mr. Grover.
UQ. Please look at that book and see (book shown to witness). A. I think there is a balance against him yet, so far as that is concerned, on the books; yes, sir; it appears so; this is the bank book.
“Q. ■ That is Florida’s bank book, isn’t it, or deposit book with your bank? A. It appears to be; yes, sir.
“Q. Covering that date? A. Yes, sir.

“Q. I will ash you, Mr. Nelson, if it does not appear from this booh that on the ninth of January, 1893, Florida’s account was overdrawn ‡7,798.53? A. It appears so from this booh.”

The defendant’s counsel' offered in evidence the pass-book of A. K. Florida above referred to.
“Q. Now, Mr. Nelson, after the eleventh day of *191 January, 1893, Florida’s account was practically closed, wasn’t it? A. Yes, sir.
“Q. He made no more deposits there? A. I don’t think he ever did. Mr. Grover: Is that the end. of his account? (Witness refers to the end of the account in the pass-book of A. K. Florida offered m evidence above, a copy of which is hereto attached and marked Exhibit ‘C.’)
“Q. Yes, sir. A. Well, he never did then, if that is the end of it.
UQ. And this account was closed, showing, after the discount of the six thousand dollar note sued on, still a balance against him by overdraft of $57.19? A. Yes, sir.
“Q. Now, I will ask you if this entry here of $6,000 discount under date January 9 — the discount carried out being $5,989.34 — isn’t it the entry of the discount of the note here sued on which you testified about. A. Yes, sir; it appears to be.
“Q. Now, Mr. Nelson, as I understand you, Mr. Burr, and not Florida, brought.that note to you on the ninth day of January, and told you to discount it? A. Yes, sir.
“Q. You didn’t see Florida that day at all? A. I think not, sir.
“Q. You didn’t notify Flannagan of your intention to discount that note, did you, when you discounted it? A. No, sir.
“Q. It was within seven days of its maturity, wasn’t it? A. Yes, sir.
“ Q. It had been there some days when it had been rejected as a discount; between the time it had been rejected and the time of the discount, though, it might have been ten days that intervened? A. Yes, sir; well, it had been there some days; four or five days, any way.
*192 ,UQ. Where was it during that interval? A. I think it was in Mr. Burr’s possession as collateral for any overdraft he .might make.

“Q. Do you Jcnow that, except from what Mr. Burr told youf A. No, sir.

e‘Q. You don’t know? A. It wasn’t in my possession.
“Q. It wasn’t in your possession? A. No, sir; if it was in the bank.
“Q. If it was in the bank at all it was .in Mr. Burr’s possession? A. Yes, sir.
“Q. Now, Mr. Nelson, what were the assets — can you give the assets that were turned over by Florida to Dickson, for your benefit? A. I don’t think you should dignify them by calling them assets.
“Q. Well, what did he turn over to Dickson for the bank? A. I am unable to state here.
“Q. Will you furnish a statement for me? Will you furnish a list of the assets delivered by Florida to Dickson, for my use, and a statement of the amounts collected on them by Dickson, and turned over to the bank, for my use? A. Yes, sir.”
Defendant Flanagan testified that he signed the note on December 14, 1892, simply and purely as an accommodation for Florida; that he never received a cent for so doing on that date, or at any other time; that Florida requested him to sign the note, in order to enable him, Florida, to discount it that day to close a deal on that day, saying he would return the money in a few days. First learned that Florida had discounted this note on January 9, 1893. As he (Florida) started out of the office of witness, he said he did not know whether the St. Louis National would discount that note or not and said: “Give me another note and if I don’t get it from the St. Louis National Bank I will get it from the Laclede Bank.” “I gave *193 Mm a note from the Laclede Bank and he came back and said he got it from the Laclede. The understanding was that one of the notes was to be returned to me. It ran along about ten days and I asked him for this note and he said Burr had it but he could get it at any moment.”
On the morning, of January 9 Mr. Hammet told defendant to get Florida to give him that note. He then testified Hammett was in El Paso. Saw him buy his tickets for himself and son, and provide himself with .money to start. He had been to his office since and knew he was gone. Defendant then offered Mr. B. F. Hammet’s deposition, to which plaintiff objected because no sufficient foundation had been laid, but the court admitted it.
This witness testified that on Saturday, January 7, 1893, Florida told him of Mr. Nelson’s refusing to let him deposit ceftain drafts in plaintiff’s bank that afternoon. Witness spoke to Mr. Nelson about what Florida had told him, and said to Mr. Nelson he was going to see Florida that night and try to find out how he stood, and to try to tide him over his troubles. He said Mr. Nelson treated the information lightly. Witness staid up late that night with Florida discussing his affairs. On Sunday morning, January 8, Hammett and Florida met at Hammett’s office to renew the discussion. They resolved to call into their councils William E. Burr, the cashier of the bank, and he, being telephoned for, came over, and the three entered upon the subject of trying to devise some plan to tide over Mr. Florida’s financial trouble. Hammett says the discussion was, in the main, about Florida’s general indebtedness; his indebtedness to the bank was also mentioned, but was not specifically discussed. Burr says the discussion was about his debts that were pressing him most; his indebtedness to the bank was not specially discussed. *194 Neither Hammett nor Burr at the moment knew Florida’s real condition, nor any of his frauds on the bank; for Burr offered to lend him $3,000, and Hammett offered to raise money for him also. In his direct examination Hammett said that during this discussion of the ways to help Florida, Burr, in suggesting available assets, called attention to this accommodation note of $6,000, which he said was there in or on Ms desk, and had never been discounted, but Florida promptly sail “we better not discount that now.” On cross-examination Hammett said:
“Q. This note, now, that was lying at the St. Louis National Bank, Mr. Burr stated, if I understand you, had not, up to that time, been discounted? A. No, sir, it had not.
“ Q. Well, didn’t Florida say that if he would use that note, that that would help him to that extent? A. That was not my understanding.
“Q. How? A. I don’t remember it that way.
“Q. What did Florida then say about the note? A. The note was mentioned, and my recollection is that Florida said not to discount it.
“ Q. Did he give a reason why it shouldn’t be discounted? A. I don’t remember that he did.
“Q. He just said, then, if I understand you, that he didn’t want that note discounted? A. Yes, sir. ”
An effort was made to show by Hammett that Florida gave as a reason, that, as the note had only a few days to run, he might get Flanagan to give a new note at longer time, but Hammett said he did not remember it that way, and did not remember that any such thing was said by Florida. Burr, however, testified that in talking it over he said, “There is that $6,000 note; I see no reason why Mr. Nelson will not discount that for you to-morrow.” He said: “That has only a short time to run, and I think we had better not, *195 because I think I can get Mr. Flanagan to make a new one for thirty clays longer; that will give me all the time I need.” * * * The note was mentioned several times, and it was left with the understanding that he was to see Mr. Flanagan the next morning.
“Q. What did you say? A. He told me to hold the note until the next morning, as he would see Mr. Flanagan and see if he could get a new note for thirty days longer, and if so, he would bring that down and take up his old one.”
Hammett, on Sunday afternoon, took Florida out to Mr. Nelson’s residence at Normandy. At the interview at Mr. Nelson’s house it was unfolded that Florida had succeeded in passing off bogus- drafts on the plaintiff bank to the amount of at least $25,000. Mr. Nelson thereupon informed Florida he could put him in the penitentiary for his conduct, and demanded an immediate settlement, and thereupon Mr. Nelson and Florida came to the residence of Mr. Dickson, the attorney of the bank. Mr. Dickson says that Florida admitted his fraud, and said he had promised Nelson to protect the bank and was anxious to do it. The amount of overdraft was stated in a general way to Dickson. Florida mentioned certain personal assets which he held and certain equities in real estate which he owned, which he would transfer to Dickson as trustee for the bank the next day, to secure his overdrafts, amounting to $24,128.40.
At Dickson’s house it was arranged that Florida should give the note for $24,128.40, and should put up. collateral securities for it, and the transaction would, appear on the books as a loan, and not as overd/i'afts;- and Mr. Nelson tells us that Florida’s account would: have shown the overdrafts to the amount of that note' if they had been charged back against him, but they were not. Florida executed the note, which was, pro, *196 duced at the trial, and transferred certain real and personal assets to Dickson to secure it, and Nelson tells us that those securities were to secure the amount which Florida confessed, on Sunday, to have overdrawn.
Neither at Nelson’s house nor at Dickson’s, was the $6,000 note in suit referred to as being collateral held by the bank for Florida’s overdrafts. Nelson did not seem to know that the note was still in Burr’s hands. He was acting on Sunday afternoon evidently on the theory that the overdrafts confessed to by Florida at his house were all of them and that the bank had no security for them.
■ On Monday morning, January 9,1893, Mr. Nelson made a further examination and discovered Florida was overdrawn $7,789.53, in addition to the $24,128.40 of fraudulent overdrafts on outside banks. He called his cashier’s attention to this fact and Burr said to him: “I have a $6,000 note as collateral for that overdraft.”
, Burr, the cashier of the plaintiff bank, testified for plaintiff. He said that in the interview at Hammett’s office on Sunday, the eighth, he said to Florida: “There is that $6,000 note; I see no reason why Mr. Nelson will not discount that for yon to-morrow.” He answered: “That has only a short time to run and I think he had better not because I think I can get Mr. Flanagan to make a new one for thirty days longer, that will give me all the time I need.” Burr did not remember this note being mentioned at Mr. Dickson’s house that Sunday night. He says Monday morning, about 10 o’clock Florida came into the plaintiff bank and said to him: “Burr, you may just as well have that, note of Flanagan’s discounted to-day and give me credit for it if my line has leen reduced enough to stand it.”
He testified that, when Mr. Nelson refused to discount the note, .Florida brought it to him and left it *197 with him, saying he would come again and get it again and present it to the board, or have him present it for him when some of his paper was paid. He told him to hold it to make good any overdrafts he might have and if his account justified it to have it discounted and placed to his credit. On the ninth of January he took the note .to Mr. Nelson and Mr. Nelson approved it and the proceeds were credited on Florida’s account.
At the close of the evidence plaintiff asked the court to give the following declaration, which it refused :
“The court declares the law to be that if the plaintiff, on the ninth day of January, 1893, discounted the note in suit at the request of Florida, and gave him credit on his account current for $5,989.34 in cash, as and for the proceeds of said discount, and thereby and to that extent canceled an existing indebtedness, then overdue from Florida to the bank, then the plaintiff is entitled to recover.”
Thereupon the court found for defendant and gave judgment accordingly.
I. Counsel have discussed various questions in their several briefs. The case was tried to the court without a jury. The issues of fact were found for the defendant and there was substantial evidence to support the court’s judgment. Under the settled practice of this court under such circumstances the verdict will not be disturbed, unless there was error in some declaration of law given or some proper instruction refused, or some material error committed in admitting or excluding evidence.
The action was founded upon a plain note of hand and the right of plaintiff to recover is directly in issue. The plaintiff tendered the circuit court only one theory upon which it based a right of recovery and that is found in its one declaration of law wherein it prayed *198 the court to declare that if the plaintiff on the ninth of January, 1893, discounted the note at the request of Florida, and gave him credit on his account current, as and for the proceeds of such discount, and thereby canceled an overdue indebtedness to that amount, then it would find for the plaintiff. The learned and indefatigable counsel for plaintiff has argued that the extension of the time of payment of the debt created by the overdraft by the discount of the note sued on rendered plaintiff a purchaser for value, and he has collected many authorities. Without questioning the correctness of the principle he invokes, it is sufficient to say that no such question as that was presented to the trial court and it is not open for review here. There was most clearly no effort made to prove that Florida asked for an extension or that the bank granted any, and, if counsel desired to have the circuit court pass upon the question he so thoroughly discusses in his brief, he should have asked the trial court to pass upon it. It can not be said such a question appears on the record proper and we are forbidden by express statute to pass upon matter of exception which has not been expressly decided by the circuit'court. Section 2302, R. S. 1889.
The judge of the circuit court filed a short memorandum in writing when he decided the case and counsel for plaintiff has argued this as an instruction. This written opinion is not part of the record proper, but if it should be so construed, it is nothing more nor less than a finding by the court. The finding is a mixed one of law and fact. The whole case was predicated upon the essential fact that the bank had discounted the note at-the request of Florida. As to Flanagan, the accommodation maker, the paper writing was no more than a blank until Florida had negotiated it, and this the trial court finds he never did, and if the court *199 was justified in so finding, its reasons for so doing are immaterial.
Did the evidence justify Ms conclusion? The St. Louis National Bank was named as payee therein, and it was intended to be used, and discounted as an original discount. . Flanagan owed the bank nothing, and Florida owed it no debt then due. Not only the unquestioned evidence in the case, but the inference arising from the terms of the note itself, is that it was drawn for the purpose of obtaining a loan to its amount from the payee bank by an original discount; not only this, but was offered to the bank for discount and refused. The discount was declined because Florida, the principal maker, had already borrowed on other paper all the money which the bank was willing to loan any one customer. As between Florida and Flanagan the power of attorney to use this note was revoked when Mr. Flanagan called upon Florida to return it to him when Florida informed him he had obtained the discount of the Laclede Bank, and promised to return it. So that it is evident the original purpose of executing the paper had failed, and it was not then binding upon anyone; up to this time, at least, it was no more than blank paper. Berkeley v. Tinsley, 88 Va. 1001.
Mr. Flanagan testified that Florida told him he had left the note with Burr but could get it at any moment. The president of the bank, Mr. Nelson, the cashier, Mr Burr, and Mr. B. F. Hammett, all testify that this note had not been discounted on Sunday, January 8, 1893.
If the circuit court credited Mr. Burr’s first story then the note was in Burr’s custody, not as an officer of the bank, and it was not held by him as a security for any indebtedness of Florida’s, but Burr was a mere depositary, from the day Mr. Nelson refused to dis *200 count it down to the ninth of January, 1893. Giving the broadest construction to Florida’s language to . Burr when he left it, the leaving of the note at that time conferred no title to it in the bank.
Burr testified when his deposition was taken before the trial, ‘ ‘He left it with me, asking me to hold it for him a few days and he would come and get it again and present it to.the board or have me present it for him when some of his paper was paid.” Upon the trial in answer to plaintiff’s counsel he testified : “He told me to hold it to make good any overdi’aftsthat he might have and if his account justified it to have it discounted and placed to his credit.” And the same witness on Sunday, the eighth of January, 1893,' suggested to Florida, that he might get this note discounted. So that if we believe his first statement he merely held the note as bailee for Florida subject to Florida’s call for it, to present it to the board for discount at some later day. This condition never happened and it is clear that under this arrangement Burr had no power or authority to take that note out of Mr. Florida’s pocket book in the vault, and discount id on the books of the bank.
But if that statement was untrue, and Florida told him to have it discounted and placed to his credit if his account justified it, then it requires too much credulity to believe that a discount board which had refused to discount this note when they supposed Florida was perfectly solvent “because his line was amply full,” would consider that same line justified it, when they had become apprised on the day before that to that string had been added $32,000 mobe, without any security and after they knew that Florida was guilty of felony and was hopelessly bankrupt and insolvent, and yet the trial court was called upon to believe one or the other of these stories, or the other and third *201 explanation by Burr that on the morning of January 9, 1893, Florida carelessly and with nonchalant air said to Burr, “Burr you may just as well have that note of Flanagan’s discounted to-day and give me credit for it if my line has been reduced enough to stand it.”
Bearing in mind that Mr. Nelson did not see Florida on the ninth day of January at all; that Florida did not present this note to him for discount; that on Sunday the eighth, Florida, in the presence of Hammett, a disinterested witness, refused to permit this note to be discounted, when his necessities were overwhelming him, and that in his interviews with Mr. Nelson at his home at Normandy, and with Mr. Dickson, the attorney of the bank, though he was warned by Mr. Nelson “that he knew he could be sent to the penitentiary” he never once named this note as an asset nor asked to have it applied on his indebtedness,' it is remarkable that nothing more was said by him to Burr that morning. Burr made no inquiry as to his effort to get a new note from Flanagan. Burr did not ask him why he had changed his mind. No direction was given where or how to apply the proceeds. Burr says he got the note out'of Florida’s pocket book and handed it to Mr. Nelson who put it through the course of having it entered on the books as a discount in Florida’s absence.
The claim that Florida’s account had been reduced so as to justify a prudent discount board in granting him this discount on that morning is a too palpable pretense, and is not consistent with Mr. Nelson’s reason for discounting it, which was that “Florida had already anticipated the discount of that paper by drawing the money out before that.” The trial court had these witnesses before him. He had the opportunity of observing their demeanor on the witness *202 stand. He must have found that the right of the bank to discount that note depended entirely upon the credibility of Burr, and he must have weighed the temptation that confronted Burr, to resort to the subterfuge of telling Mr. Nelson that he held this note as collateral for overdrafts when he was called upon to account that morning to his superior, for his loose conduct of the affairs of that bank by permitting Florida to overdraw his account to such an extent.
The circuit court was not required to accept such an improbable story, especially when the evidence shows that Florida only the day before refused to permit the discount, and Burr made no claim then that he held it ay collateral. It was far more consonant with our knowledge of human action and motives to believe that in view of the great and impending losses that were about to fall upon that bank by permitting Florida to overdraw his account and by cashing his “Kiting” drafts on country banks in which he had no funds, that Mr. Burr bethought him of this note which had been confided to him as bailee, merely as a means of retrieving at least a portion of those losses and counting upon the acquiescence of Florida who would hardly protest against it in view of the threatened prosecution for felony. It is much easier to believe what Mr. Nelson says when he testified “His account needed it and I tooh it.”.
The court then found that Florida did not request the discount and if he did not, of course the bank acquired no title to the paper, and no obligation was created against Flanagan, who could only be bound by Florida’s obtaining a discount and not by the unauthorized appropriation of the note by Burr and the mere book entries of the bank. 1 Daniels, Neg. Ins., sec. 779 b. As plaintiff’s instruction was predicated upon *203 the discount at Florida’s reguest and the court found these facts against it, there was error in refusing it.
II. There was no error in permitting Flanagan to testify not only that he was a mere accommodation maker of the note but the purpose for which Florida ■stated he wanted the discount when he obtained Flanagan’s signature. He was attempting to show a diversion of the note and the initial step was to show its ■original purpose, and notice to plaintiff of that purpose. The evidence was material and competent though he might fail to satisfy the court of the diversion.
III. During the examination of Mr. Nelson he was . asked by counsel for the bank, “Did Mr. Florida ever speak to you about this discount after the ninth of January?” Upon objection, that Flanagan could not be bound by any statement of Florida’s after the discount, the court held the witness could not answer and plaintiff excepted. No offer was made by plaintiff to show for what purpose he desired to show the conversation, nor the purport of that conversation. It may have been wholly immaterial. Its exclusion constitutes no error. Bank v. Aull, 80 Mo. 199; Jackson v. Hardin, 83 Mo. 175; Hickman v. Green, 123 Mo. 165.
IV. Burr, the cashier, was asked, “Did Mr. Florida say anything to you concerning the nature of the consideration between him and Flanagan for the execution of the note in suit?” This was objected to as immaterial as Mr. Flanagan had simply testified it was an accommodation note. Here, again, no purpose of the proposed evidence was indicated. The note on its face purported to be for value and Florida was entrusted with it for the purpose of discounting it. It could not under the circumstances, have changed plaintiff’s relation to the note to have shown that it was for value, and surely plaintiff would not have offered evidence to *204 impeach it. We think it was not error to exclude it-because no offer was made of the proposed statement and, secondly, because it was immaterial as the note purported to be for value, and if plaintiff acquired it legitimately in the due course of business, before maturity the fact that it was an accommodation paper would constitute no defense.
Y. Mr. Burr was also asked, “Do you remember whether you at any time told him that you had at his request had the paper discounted1?” This was certainly immaterial from this witness. He had already testified that Florida had requested him to discount the note and that he had passed it to Mr. Nelson and discounted it. If he had spoken the truth the discount was then complete and the mere conveyance of knowledge of that fact to Florida could have had no effect upon the rights of the bank or upon the makers of the note. There was no error in excluding this question.
Burr also testified that, within ten days after he had entered this transaction on the bank books, the bank clerks wrote up Florida’s bank book showing his-account with the bank and when he gave it to Florida,, he went off in a corner and sat down and examined it and said “All right,” and, upon motion of defendant,, that statement was stricken out, and this is assigned as-error.
This evidence is utterly at variance with the previous testimony of Burr. As we have already said, if Burr’s other evidence is to be believed, Florida, so far as he was capable of passing the title of this paper-under the circumstances, had already sought and procured a discount. When that was done, the rights of the bank were fixed, and nothing Florida might say by way of approval or disapproval would affect its title to-the paper. Under this view of the evidence the court *205 most clearly was right in holding Florida’s subsequent statement immaterial.
But it is said now the purpose was to show ratification. But ratification of a previous lawful authority adds nothing whatever. Are we then to understand that by offering this evidence plaintiff concedes that the .appropriation of this note on the ninth day of January by the bank was without the prior' authority or consent of Florida, and that it now proposes to uphold its title to it by the subsequent ratification of Florida? If so, it will be necessary to examine the merits of this claim.
If we correctly grasp the argument of counsel it is predicated upon the claim that Burr was Florida’s agent to discount this note. This evidence is utterly inconsistent with any ground of recovery asserted either in plaintiff’s petition- or reply. Plaintiff declared in its petition upon a plain promissory note executed and delivered to it on December 14, 1892. In its reply it averred that Florida, on the ninth day of January, 1893, requested plaintiff to discount said note and place the proceeds to his credit as cash and that in pursuance of said request it discounted said note. It now proposed by this evidence to prove not a discount by previous request and negotiation, but a ratification by Florida of a forcible appropriation of the note without his previous consent, and against his positive direction.
It is perfectly obvious that the court was right in excluding this evidence, under these pleadings. In Pier v. Heinrichoffen, 52 Mo. 333, the petition averred a demand made at the maturity of the note, and this the answer denied. On the trial plaintiff attempted to-prove an excuse for not making a demand as alleged in the petition, and it was held that if plaintiff desired or expected to recover upon facts dispensing with the necessity of a demand, he should have pleaded them, *206 and the evidence was properly rejected. Garvey v. Fowler, 4 Sand. (N. Y. Super. Ct.) 665; Shultz v. Depuy, 3 Abb. Pr. 252; Lumbert v. Palmer, 29 Iowa, 104. In the last case it was held that, under an averment of demand, proof of a waiver was inadmissible. Cole’s Adm’r v. Wintercost, 12 Tex. 118.
In Bank v. Hatch, 78 Mo. 13, it was held that an. instruction relating to waiver of demand and presentment was properly refused, the court, through Mabtin, Commissioner, saying: “When the plaintiff, in his petition, alleges presentment, * * * he is not permitted, under our practice act, to prove that the defendant waived such conditions.77 2 Edwards, Bills and Notes [3-Ed.], see. 949. And to the same effect is Nichols, Shepherd & Co. v. Larkin, 79 Mo. 264, in which it is held that upon a plea of compliance with a condition precedent, evidence will not be received to show waiver thereof. All these cases were subsequently approved in Lanitz v. King, 93 Mo. 513.
That the attempt to show by a subsequent ratification an excuse for not proving the case alleged in the petition or reply falls within the exact principle of all these cases is entirely plain, and therefore the court-committed no error in excluding the evidence offered for that purpose.
YI. There was no error in admitting Nelson’s deposition. The only objection to it was that the witness was present in court. The objection now urged that the statements were not made in the execution of any duty imposed upon him as president of the bank was not made in the circuit court, and can not be considered here. But if there had been error- in this regard, the subsequent calling of Nelson and his testimony to the same facts effectually cured the error.
YII. There was ample foundation for the admission of Hammett’s deposition, and even if the court *207 had committed error in this respect, Hammett’s evidence is no ground for reversal, as every material fact to which he testified was corroborated by plaintiff’s own witnesses, Burr and Nelson.
VIII. We have examined all the assignments of error with great care. Our conclusion is, not only that there was no error in these respects, but that, upon the whole case, the judgment was for the right party.
There was ample evidence in the circumstances from which the trial court was justified in finding that the bank was apprised of the motives which induced Flanagan to lend his aid to Florida. When Flanagan signed the note, Florida was reputed to be entirely solvent. Not only Flanagan thought so, but Mr. Nelson did. Having confidence in the solvency and integrity of Florida, Flanagan loaned him his name for $6,000 in the utmost good faith. Mr. Nelson refused to discount at that time. Florida did not discount this paper, but promised to return it to Flanagan. On the seventh of January, Florida had, by fraudulent practices, obtained $32,000 from the plaintiff bank, for which it held no security. On January 8 Florida confessed to F. M. Nelson he was a felon and a bankrupt. On Monday morning Mr. Nelson was doubtless astounded when he learned Florida was overdrawn in his current account nearly $8,000; and thereupon he called Burr, his cashier, to account, and then Burr resorts to the claim that this note had been left as collateral, and that he was authorized to discount it.
That note had been rejected once because Florida’s line of discounts was full. It had now only six more days to run. Surely it was a most unbusinesslike transaction for a note with as good a name as Flanagan’s to remain undiscounted when Florida was so pressed for money. Would not prudence suggest that there must be some good and valid reason why this *208 note had never been cashed? What was this note doing in the hands of a man whom plaintiff knew to be a felon and hopelessly insolvent? Was there not enough here to put a prudent man on inquiry? Florida and Flanagan were easily accessible, but no questions were asked. The note was taken by Burr out of Florida’s private pocket book in the vault, and discounted on the books of the bank. Florida, only the day before, guilty as he was, was unwilling to defraud Flanagan, who had been his friend, for he refused to permit the note to be discounted. Under these circumstances, it seems to us the court very properly held that the appropriation of the note was without Florida’s request or consent, and that it never became a valid obligation of Flanagan. The judgment is affirmed.
Sherwood and Burgess, JJ., concur.